# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA
# MIAMI DIVISION

CASE NO. 1:16-CV-24894-JLK

EARLINE MCBRIDE,

    Plaintiff,

v.

CARNIVAL CORPORATION d/b/a
CARNIVAL CRUISE LINES, INC.,

    Defendant.

_____/

## OMNIBUS ORDER ON *DAUBERT* MOTIONS

**THIS MATTER** comes before the Court upon Defendant Carnival Corporation's ("Carnival") *Daubert* Objection to Plaintiff's Expert Frank Fore (D.E. 76); Plaintiff's *Daubert* Objection to Defendant's Expert Zdenek Hejzlar (D.E. 82); and Carnival's Motion to Strike or Limit Testimony of Plaintiff's Expert Dr. Thomas Roush (D.E. 77), all timely filed by the July 8, 2019 motions deadline.[1]

### I.     BACKGROUND

This personal injury case arises from Plaintiff's fall from her wheelchair on November 23, 2015, while disembarking Carnival's vessel at a ramp within a gangway leading into the terminal building at the Port of Miami.

Plaintiff proffers Frank Fore to testify as an expert on Carnival's liability for Plaintiff's fall. Mr. Fore is a mechanical engineer who has been a "forensic accident investigator" since 1985

---

[1] The Court has also considered the parties' Responses in Opposition to the respective motions (D.E. 93; D.E. 91; D.E. 90), all timely filed by July 22, 2019.

(D.E. 67-2, at 4). On May 6, 2019, Mr. Fore "inspected, measured, and photographed the scene of the incident" (*id.* at 9), reviewed materials from the case, safety regulations and standards,[2] and various scientific and technical literature on biomechanics (*id.* at 5). Mr. Fore dedicates 15 pages of his expert report to "biometric analysis" of Plaintiff Ms. McBride, including "torso acceleration analysis" and "back shear force analysis" (*see id.* at 20–35). He then lists eleven opinions, including (a) that "[t]he abrupt vertical change in pathway elevation and the steeply sloped Ramps represent known safety hazards . . . out of compliance with . . . safety regulations" and "was a substantial contributing cause of the mishap;" (b) that Fritz Charles's (an employee of Carnival's independent contractor) rapid pushing of the wheelchair was "a decisive component of the ejection as shown by . . . ejection calculations;" (c) that there were "[r]easonable cost-effective solutions that Carnival could have performed to remedy" the hazardous condition; (d) that it "was and is technically feasible to have the subject Ramp flush with the adjoining walkway surfaces *on both sides of the ramp*, as is done in countless jetway passenger boarding bridges;" and (e) that the safety regulations and standards he relied on (*see supra* n.2) are widely followed "in public venues, including maritime" (*id.* at 18–19).

Moreover, Carnival proffers Zdenek Hejzlar to testify as an expert regarding its liability for Plaintiff's fall. Mr. Hejzlar has "over 28 years of experience in premises/occupational safety" and "is involved in . . . risk mitigation consulting with major cruise lines and resorts" (D.E. 66-3, at 17). He inspected the gangway ramp that was the site of the accident "when the Carnival Ecstasy

---

[2] The "safety regulations, codes, standards, guidelines, and recommendations" Mr. Fore lists as having reviewed in his expert report for this case are: SOLAS, Regulation 13; International Maritime Organization, *International Safety Management Code* (2002); IMO, MSC/Circ. 735 (24 June 1996); NFPA 301, *Code for Safety to Life from Fire on Merchant Vessels*, LSC, *Life Safety Handbook*, Quincy, MA: Nat'l Fire Prot. Ass'n; U.S. Access Board, *Draft Passenger Vessel Accessibility Guidelines* (2008); ASTM F-1637: American Society for Testing and Materials: *Standard Practice for Safe Walking Surfaces*; Florida Building Code, Building, 5th Ed. (2014); and Florida Building Code, Accessibility, 5th Ed. (2014).

2

came to the Port of Miami on July 26, 2018" (*id.* at 4), and took numerous photographs and measurements (*see id.* at 35–37). Mr. Hejzlar lists nine opinions, including (a) that "the passenger bridge, including transition ramps, compl[ies] with applicable industry standards;" (b) that "[Plaintiff's] fall was not caused by the design, installation or use of the passenger bridge or the transition ramp;" (c) that the "design, material and weight [of the ramp in question] do[es] not create a gap as described by [Plaintiff];" and (d) that neither Carnival nor its contractor had "notice or reason to believe that anything about the design, construction or use of the passenger bridge was unreasonable or dangerous" (*id.* at 15).

In addition, Plaintiff proffers Dr. Thomas Roush, an orthopedic spinal surgeon who she first visited on November 1, 2017, to testify both as a fact witness regarding his care and as an expert witness regarding the extent of Plaintiff's injuries, the cause of her injuries, and the cost of future procedures she might need. Specifically, Dr. Roush's expert opinions contained in his March 1, 2019 "narrative report" are (a) that Plaintiff sustained a "33% permanent partial impairment of the whole person" according to the AMA Guidelines Evaluation of Permanent Impairment Sixth Edition, based on 21% impairment for lumbar spine, 8% for "SI joint," 3% for right shoulder, 2% for hips, and 3% for knees; (b) "that the injury sustained to [Plaintiff's] back, SI joint, hips, knees and shoulders are [a] direct result of the injury sustained on the incident on 11/23/2015" based on comparing MRIs taken of Plaintiff in 2009 and 2017 and reviewing her prior medical history; and (c) that Plaintiff is estimated to incur additional future costs for follow-up imaging and therapies and "may require invasive procedures to help control her chronic pain" with estimated costs of "$55,000 for the right shoulder, $50,000 for the right hip, $65,000 for the right and left knee and $150,000 for the lumbar spine . . . based on hospital fees, physician fees, and anesthesia fees" (D.E. 77-1, at 6–8). Carnival moves to strike or limit Dr. Roush's testimony on

3

the cause of Plaintiff's injuries, and some of the estimated future costs, including that she may need invasive procedures (D.E. 77, at 2–3).

## II. DISCUSSION

### A. Legal Standard

The admission of expert testimony is governed by Federal Rule of Evidence 702, which provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

"The inquiry envisioned by Rule 702 . . . is a flexible one. . . . The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 594–95 (1993). The importance of *Daubert*'s gatekeeping requirement cannot be overstated. *See United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). As the Supreme Court framed it in *Kumho Tire*: "[T]he objective of that requirement is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Frazier*, 387 F.3d at 1260 (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999)). The district court's role is especially significant since the expert's opinion can be both powerful and quite misleading because of the difficulty in evaluating it. *See id.* (internal quotations and citations omitted). Indeed, no other kind of witness is free to opine about a matter without any firsthand knowledge of the facts in the case, and based upon otherwise inadmissible

4

hearsay if the facts or data are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." *Id.* (quoting Federal Rule of Evidence 703).

Thus, in determining the admissibility of expert testimony under Rule 702, courts engage in a rigorous three-part inquiry. *Id.* Trial courts must consider whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert;* and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir.1998) (citing *Daubert*, 509 U.S. at 589). Regarding reliability, a trial court may consider: "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *Frazier*, 387 F.3d at 1262 (internal citations omitted). The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion. *Id.* at 1260.

### B. Plaintiff's Expert Frank Fore

Mr. Fore's methodology is wholly unreliable under Federal Rule of Evidence 702 and *Frazier*. The biomechanical analyses of Plaintiff's body, which Mr. Fore labels "ejection calculations" (*see* D.E. 67-2, at 20–35), do not directly support any of his eleven opinions (*id.* at 18–19), which are almost entirely based on anecdotal experience or speculation. For instance, Mr. Fore was questioned at his deposition regarding his opinion that "going backwards up the ramp" would have been safer than going forward:

> Q    Did you run any calculations with that situation where the wheelchair is going backwards up the ramp?

5

> A   I have before, so I understand the phenomena. So I've calculated and I thoroughly understand the phenomena of a rear impact versus a forward impact. When you get struck from behind, you load up into your seat back. I've calculated that hundreds of times . . . if she's going backwards, she would have loaded into the chair, not pitched out of it.
> Q   And how about as to this particular instance, did you run any calculations . . . for her going backwards?
> A   No. It's a well-known phenomena by me.

(Fore Dep., at 114:8-23 (D.E. 76-2, at 6)). Not only does Mr. Fore confuse a backward-moving wheelchair running into an obstacle with a wheelchair "get[ting] struck from behind," but a "well-known phenomena by [a single expert witness]" is not the same as a principle generally accepted by the scientific community based on repeatable peer-reviewed studies. Further, his opinion that it was technically feasible to have the gangway ramp flush with the walkway surfaces is only supported by visual observation of the Atlanta airport jetway:

> Q   Did you investigate whether the types of jetway bridges that are used in or around airports in commercial passenger flights, would those type of jetway bridges be technically feasible in this application, did you undergo any sort of investigation or do any research to determine that?
> A   I compared them and they could be modified to be used in this type of application.
> Q   How is it that you compared them?
> A   Visually. I didn't have blueprints for either one of them, but I flew before this inspection, I flew immediately after this inspection. I spent time at the Atlanta Airport before and after.

(*id.* at 97:14–98:1). This does not describe the type of reliable scientific methodology that can support an expert opinion under the Federal Rules of Evidence.

Moreover, the Court agrees with Carnival (*see* D.E. 76, at 7–8) that an opinion such as how to safely push a wheelchair does not meet the helpfulness prong of *Daubert* as the issue requires no specialized scientific understanding to evaluate. Equally, Mr. Fore's testimony that the safety regulations and standards he relied on "are applicable" to the area where the injury occurred in this case (*see, e.g.*, Fore Dep. at 80:5–81:6; 86:15–87:3 (D.E. 93-1, at 9–10, 13–14)) would not be

6

helpful to the jury, as whether the standards are legally "applicable" in the gangway area are purely legal issues. Finally, the issue of whether Carnival had prior notice is a legal issue, and it would not be helpful for Mr. Fore to opine that Carnival was aware of a prior incident that he considers to also be caused by "the dangerousness of the gangway ramp" (D.E. 93, at 14), as this would be telling the jury how he thinks they should rule.

As such, Plaintiff has failed to meet her burden under *Daubert* regarding Frank Fore's reliability and helpfulness as an expert witness in this matter.

### C. Carnival's Expert Zdenek Hejzlar

Correspondingly, the methodology of Carnival's expert Zdenek Hejzlar is also unreliable under Rule 702 and *Frazier*.[3] As Plaintiff notes, while Mr. Hejzlar provides measurements such as the "purported degree measurements of the slope of the ramp, he provides no detail as to how he arrived at these measurements, such that his methodology could be tested" (D.E. 82, at 4). Moreover, Mr. Hejzlar states in his expert report that "reportedly the same disembarkation deck has been used ever since the bridge was installed," but that the tide changes the angle of ramp that is part of the deck (D.E. 66-3, at 4). He describes no repeatable scientific methodology regarding how the angle of the ramp he measured at his investigation relates to the angle of the ramp Plaintiff encountered at the time of her accident.

As to helpfulness, the photographs taken by Mr. Hejzlar in his investigation of the accident site (*see* D.E. 66-3, at 34–37) could be submitted into evidence so that the jury can view them, and Mr. Hejzlar might be able to serve as a fact witness to authenticate the source of the photographs. However, Carnival has not shown how it would be helpful to the jury to have an expert opine on

---

[3] As Mr. Hejzlar's rebuttal expert report (D.E. 91-2) is no longer necessary as it solely regards Mr. Fore's opinions, the Court focuses on Mr. Hejzlar's main expert report (D.E. 66-3) here.

what the photographs show regarding the cause of Plaintiff's accident. Moreover, the Court agrees with Plaintiff that Mr. Hejzlar's opinion that Carnival had no notice of any unreasonably dangerous condition "invades the province of the jury" (D.E. 82, at 6), and that the trier of fact can decide on its own whether Carnival had prior notice without an expert instructing it how to rule.

Therefore, Carnival has failed to meet its burden under *Daubert* to establish Zdenek Hejzlar's reliability and helpfulness as an expert witness here.

### D. Plaintiff's Expert Dr. Thomas Roush

Carnival does not object to Plaintiff's proffered expert witness Dr. Roush testifying that Plaintiff has a 33% permanent partial impairment under the AMA Guidelines Evaluation of Permanent Impairment Sixth Edition, but objects to his expert testimony on the cause of Plaintiff's injury and estimated costs she would incur for hypothetical future treatments.

### 1. Cause of Plaintiff's Injury

Dr. Roush relies on the expert report of Frank Fore for his conclusion that Plaintiff's fall on November 23, 2015 was "the most likely cause" of her injuries (*see* Roush Dep. at 80:7-24 (D.E. 77-9, at 2)). He testifies: "Mr. Fore's report showing the forces involved were quite drastic, you know, certainly enough to create these injuries that I treated her for" (*id.* at 80:10-12). As described above, Carnival's *Daubert* objection with respect to Mr. Fore is due to be granted.

However, even setting aside Fore's opinions, Dr. Roush does not use a scientific methodology to arrive at his opinion on the cause of the injury. In formulating his March 1, 2019 opinion that "the lumbar disc disruptions and spondylolisthesis in her lumbar spine are directly related to the mechanism of action in the wheelchair accident on 11-23-15" (D.E. 77-1, at 6), he did not consider the possibility that Plaintiff could have had falls or accidents subsequent to the MRI taken on October 26, 2009 (the sole data point he considered as a comparison) but prior to

8

when he first saw Plaintiff as a patient on November 1, 2017. In his deposition, Dr. Roush confirms that at his first consultation with Plaintiff, almost two years after the subject incident (Roush Dep. at 11:4-6 (D.E. 77-2, at 4)), he did not ask her about any other accidents:

> Q   Did you inquire with her, other than the wheelchair incident that she relayed in November of 2015, if she had any other conditions, incidents, accidents, injuries, etcetera, that might be related to the same type of body parts that she was complaining about?
> A   Nothing is documented, so I presume nothing was discussed in that regard.
> Q   So when she first presented to you as an established patient, the information that she provided was limited to the wheelchair incident of November of 2015?
> A   Correct.
> . . .
> Q   Did she relate any chronic conditions related to her shoulders, back, knees or hips that preceded the November 2015 wheelchair incident?
> A   Nothing was discussed prior to this wheelchair incident.

(id. at 22:1-14, 23:1-6 (D.E. 77-2, at 5–6)). Dr. Roush is unable to confirm that he considered Plaintiff's past medical records "prior to the preparation of either of [his] narrative reports" because "[t]he narrative really speaks more to [Plaintiff's] treatment and future medical needs" (see id. at 58:9–60:1 (D.E. 77-8, at 3–5)).

Dr. Roush summarizes his methodology on determining causation:

> Q   And how did you—did you also rule out an intervening fall that she had as a potential cause for her injuries that you've opined here?
> A   Well, I did . . . I'm talking to Ms. McBride. She's telling me the symptoms are consistent with what I would expect from this kind of impact that, you know, I saw spelled out, you know, mechanically from Dr.—from Mr. Fore and then also from my perspective. You know, seeing the symptoms in an elevated rate consistent with a disc tear at L5-S1, it's just putting together the whole puzzle: the forces involved, the consistency of her symptoms, the proximity of her symptoms right after the 2015 wheelchair incident. That's how I make my conclusions.

(id. at 80:4-2 (D.E. 77-9, at 2)). As Carnival notes, the factual bases of this opinion seem to be that (1) the subject incident occurred in 2015; (2) Dr. Roush observed Plaintiff had injuries in 2017; (3) Dr. Roush did not personally see a relevant prior injury or complaint in her medical

9

records before 2015; (4) the "forces involved" were sufficient to cause these injuries; and (5) Plaintiff's pre-existing arthritis made her more susceptible to injury (*see* D.E. 77, at 9 (citing Roush Dep. at 81:10–82:9)).

Because Dr. Roush's summary of his methodology does not add up to a reliable scientific methodology under *Frazier*, and the jury will be capable of drawing its own conclusions on causation from the evidence, Carnival's motion to preclude Dr. Roush's testimony on the cause of Plaintiff's injury is due to be granted.

### 2. Estimated Costs for Hypothetical Future Treatments

During his deposition, Dr. Roush admitted that the cervical and thoracic spine therapies he included in his list of estimated costs are not relevant to the injury that is the subject of this suit (*see* Roush Dep. at 88:14-21, 93:15-18 (D.E. 77-9, at 5–6)), and Plaintiff now concedes in her Response brief that "Dr. Roush will not testify" on that point (D.E. 90, at 13–14). An example of Dr. Roush's remaining recommendations is that "[t]he patient may also develop trigger points activated by exacerbations that will require trigger point injections" two to three times per year ranging in price from $1500 to $2000 (*id.* at 7). On June 19, 2019, Dr. Roush testified that "at this point she's progressing well," that he doesn't "anticipate any more surgery imminently for Ms. McBride" (*id.* at 99:16-18), and that his recommendations for invasive fusion procedures are "in the 20-to-30-year expectation level" (*see id.* at 98:14-25). Carnival argues that as Plaintiff is currently 65 years of age (D.E. 77, at 13 n.2), Dr. Roush's opinion that "more likely than not" (Roush Dep. at 100:20 (D.E 90-1, at 24)) Plaintiff will need $150,000 back surgery decades hence when in her 80s or 90s is unduly speculative. However, the Court concludes that such testimony, which relies on Dr. Roush's medical training, is reliable and helpful to the jury under *Daubert*.

10

## III. CONCLUSION

The parties have not demonstrated that the opinions of their proffered expert witnesses Frank Fore and Zdenek Hejzlar are based on a reliable scientific methodology or that their testimony would be helpful to the jury. Therefore, it is **ORDERED, ADJUDGED, and DECREED** that the parties' *Daubert* objections to these witnesses **(D.E. 76; D.E. 82)** be, and the same are, hereby **GRANTED**. Frank Fore and Zdenek Hejzlar are precluded from testifying as experts in this matter.

It is further **ORDERED and ADJUDGED** that Carnival's Motion to Strike or Limit Testimony of Plaintiff's Expert Dr. Thomas Roush **(D.E. 77)** be, and the same is hereby, **GRANTED in part**. Dr. Thomas Roush shall be precluded from testifying regarding what caused Plaintiff's injury, but may testify to facts he observed and to opinions that rely on his medical training such as Plaintiff's degree of impairment and future treatments she might need.

**DONE and ORDERED** in Chambers at the James Lawrence King Federal Justice Building and United States Courthouse in Miami, Florida, on this 25th day of July, 2019.

*/s/ James Lawrence King*
JAMES LAWRENCE KING
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF FLORIDA

cc: **All Counsel of Record**